On Application for Rehearing

COOK, Justice.
The opinion of November 3, 1995, is withdrawn and the following is substituted therefor. Charles L. Bence appeals from a summary judgment entered in favor of Alabama Coal Cooperative, a nonprofit corporation created by small coal producers to attract business for their companies. Bence alleges the breach of a 5-year employment contract that designated him as general manager of the cooperative and provided that he would be compensated at a rate of $.25 per ton of coal sold by the cooperative from March 1991 through March 1996. Bence, who served on the cooperative’s board of directors, was fired in June 1992, after he refused to resign his position as general manager. He sued. The trial court granted the cooperative’s motion for summary judgment, holding, in part, that the cooperative’s five-member board had not had a quorum present at the meeting at which Bence’s contract was approved.[1] In granting the motion for summary judgment, the trial court stated:
“This Court has read and reviewed all submitted materials relative to [the] defendant’s Motion for Summary Judgment.
“There are indeed complex and intriguing issues of grave proportions advanced by both parties.
“However, in the final analysis, the absence of a ‘quorum’ and Director Perry’s total lack of knowledge of the alleged contract [compel the entry of a judgment for the defendant].”
For the following reasons, we affirm.
There are five members of the board of directors of the Alabama Coal Cooperative. When Charles Bence was a member, the board consisted of Bence, Wade Floyd, Herbert Hall, Randy Johnson, and Roger Perry. When the board of directors convened on March 21, 1991, Roger Perry was absent. According to Bence, Bence and Johnson presented the board with separate proposed contracts of employment whereby Bence would become general manager and Johnson would become sales manager for the cooperative. Both, according to Bence, were to be compensated at a rate of $.25 per ton of coal sold during the five-year duration of the contracts. Bence stated in his deposition that all four directors unanimously approved a single motion to allow him and Johnson to sign the two contracts on behalf of the cooperative. Following the meeting, Bence’s contract was signed by Johnson, as secretary/treasurer of the board, and Johnson’s contract was signed by Bence, as general manager.
*132 Bence’s version of the facts is disputed. According to Johnson’s deposition, Bence and Johnson were authorized to enter into contracts with Alabama Power Company on behalf of the cooperative, but were not authorized to enter into five-year employment contracts for their own benefit. According to Johnson, the $.25 per ton compensation for Bence and Johnson was approved by the board for the duration of a one-year contract with Alabama Power. Johnson deposition, 152-54,173. Johnson’s version of the facts is supported by the affidavit testimony of the other board members.
Because we are reviewing a summary judgment, we must consider the evidence in a light most favorable to Bence. See Lee v. City of Gadsden, 592 So.2d 1036 (Ala.1992). Viewed in that light, the evidence indicates that two contracts for employment (Bence’s and Johnson’s) were discussed at the board meeting in March 1991 and that the board members who attended that meeting were informed that each contract would be for five years. Bence deposition, at 110,120. There was, according to Bence, one motion to accept the two proposals of employment. According to Bence, all four board members present at the meeting voted to approve the contracts.
In entering the summary judgment, the trial court held that there was not a quorum present at the March 21, 1991, board meeting, and that, therefore, the board did not have the authority to approve an employment contract for Bence. The trial court, in holding that a quorum was not present at the March 21 meeting, did not count Bence or Johnson, considering them interested directors in regard to the business conducted regarding their contracts. Apparently, the trial court relied on § 10-2A-63, Ala.Code 1975, part of the Alabama Business Corporation Act; that Code section, repealed effective January 1, 1995, after this action was filed, reads as follows:
“[interested directors may not be counted in determining the presence of a quorum at a meeting of the board of directors ... which authorizes, approves, or ratifies [a] contract or transaction [between the corporation and a director].”
It is clear that Bence should not have voted to approve his own contract, because as to that contract he was an “interested” director. It is equally clear that Johnson should not have voted to approve his own contract.
“[T]he rule is clear that a director cannot act in his official capacity to make contracts for the corporation that will affect his personal pecuniary interest. See Ingalls Iron Works Co. v. Ingalls Foundation, 266 Ala. 656, 665, 98 So.2d 30, 38 (1957); and Holloway v. Osteograf Co., 240 Ala. 507, 515, 200 So. 197, 203 (1941). If the interested director’s, vote is necessaxy to such a transaction, the transaction will be set aside at the instance of the stockholders. See Holloway, 240 Ala. at 515, 200 So. at 203; [.Holcomb v. Forsyth ], 216 Ala. [486] at 491, 113 So. [516] at 520 [ (1920) ]; see also Code 1975, § 10-2A-63. A director must manage the corporation honestly and impartially and may not achieve personal advantage, profit, or gain from his position. See Jefferson County Truck Growers Ass’n v. Tanner, 341 So.2d 485, 487 (Ala.1977).”
Jones v. Ellis, 551 So.2d 396, 401 (Ala.1989). The resolution to accept the contracts was presented in a single motion. Thus, both Johnson and Bence were interested in the outcome of the vote to accept the contracts. They, therefore, should not have voted.
Because there was not a quorum present at the board of directors meeting, we must consider whether there was evidence that the voidable contract was ratified by the cooperative. Considered in a light most favorable to Bence, the evidence indicates that the directors who attended the meeting knew that Bence’s contract was to be for a term of five years. Roger Perry, who had been absent from the meeting, discussed with Randy Johnson, who had attended the meeting, the fact that Bence was being compensated at the rate of $.25 per ton. Perry’s deposition indicates:
“Q. Did Mr. Bence subsequently approach the cooperative and ask to be compensated?
*133 “A. You’re talking to my knowledge of that?
“Q. Yes, sir. To your knowledge?
“A. My knowledge that that did take place.
“Q. And, in fact, Mr. Bence, after the contract was entered into between the Coop and Alabama Power, which we’ve marked as Exhibit 4, was compensated 25 cents per ton of coal provided to Alabama Power by the co-op; is that correct?
[[Image here]]
“A That was my later understanding.
“Q. (By Mr. McClees) When did you first learn that?
“A I can’t specify a date, but it was sometime after the meeting at which that took place.
“Q. After the meeting that what took place?
“A. A meeting where they voted themselves to get 25 cents.
“Q. Now, what meeting are you talking about in particular?
‘A It was a board meeting.
“Q. Were you present at that board meeting?
“A No, I was not.
[[Image here]]
“Q. You said you have an understanding of what took place at that meeting?
“A. Yes.
“Q. From whom did you—
“A. Randy Johnson.
“Q. Anybody else?
“A. No.
“Q. Was it through conversations with Mr. Johnson?
‘A Yes.
[[Image here]]
“Q. Describe to me as best you can what you recall from the conversation.
“A I was told that him and Chuck was fixing to get 25 cents a ton commission.
“Q. Randy told you that?
“A. Yes.
“Q. Did he tell you how that amount had been arrived at?
“A. Just was brought up and voted in the meeting, was approved.
“Q. That would have been at the board of directors meeting?
“A. That’s correct.
“Q. Did you express any opinion to Mr. Johnson about your feelings about that compensation?
“A. I sure did.
“Q. What did you tell him?
“A I was 100 percent opposed to it.
“Q. Why was that?
“A. This is not a brokerage company; this is a cooperative formed for the benefit of its members. Everyone was there carrying on daily activities as a cooperative for the mutual benefit of everybody that was there, not for individual gain.
“Q. Did Mr. Johnson show you the contract that he had entered to be compensated 25 cents a ton?
“A. No.
[[Image here]]
“Q. But he told you that the board had approved this compensation arrangement?
“A. That is correct.
“Q. Did you ask or request that a new board meeting be called to discuss the matter?
“A. No, I didn’t.
“Q. Why not?
“A. Well, the board met and voted on it. And if they voted on it, I was to uphold that was my feelings.”
Perry deposition, at 26-31. Perry’s deposition testimony suggests that he knew that the board of directors had voted for Bence to receive $.25 per ton. While Perry’s deposition indicates that he knew Bence was to be compensated at $.25 per ton, he claims that he understood that the compensation agreement was for the duration of the contract with Alabama Power. Perry deposition, at 33-34. The Aabama Power contract was initially to run from April 1, 1991, through March 31, 1992, but it was extended for an additional three months, through June 1992. Bence, therefore, was compensated in accordance with Perry’s understanding of the compensation agreement. There is simply *134 no evidence that Perry was ever told, or that he ever knew, that Bence’s contract was to be for a period of five years or that Bence was going to be paid under any contract other than the Alabama Power contract. This element of knowledge is vital to Bence’s argument of ratification. See Dusenberry v. First National Bank of Birmingham, 271 Ala. 207, 122 So.2d 716 (1959), wherein this Court stated:
“ ‘If the party originally possessing the remedial right [to disaffirm] has obtained full knowledge of all the material facts involved in the transaction, has become fully aware of its imperfection and of his own rights to impeach it, or ought, and might, with reasonable diligence, have become so aware, and all undue influence is wholly removed so that he can give a perfectly free consent, and he acts deliberately, and with the intention of ratifying the voidable transaction, then his confirmation is binding, and his remedial right, defensive or affirmative is destroyed. If, on the other hand, the original undue influence still remains, or if the act is simply a continuation of the former transaction, or if the party wrongly supposes that the original contract or transaction is binding, or if he has not full knowledge of all the material facts and of his own rights, no act of confirmation, however formal, is effectual; the voidable nature of the transaction is unaltered.’ ”
271 Ala. at 213, 122 So.2d at 721 (quoting 3 Pomeroy’s Equity Jurisprudence, § 964, p. 860 (5th ed.)). (Emphasis added.)
Even considering the evidence in the light most favorable to Bence, we must conclude that Perry did not have sufficient knowledge of Bence’s contract to create a jury question on the issue of ratification. Thus, the trial court properly entered the summary judgment. That judgment is, therefore, affirmed.
OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; AFFIRMED.
HOOPER, C.J., and MADDOX, SHORES, and KENNEDY, JJ., concur.
BUTTS, J., concurs in the result.
HOUSTON, J., dissents.

. Bence's contract was approved at the same time another board member’s contract was approved. Both contracts were approved on a single motion that they be accepted, and both interested directors voted to approve the contracts.